**B & B ELECTROPLATING CO., Inc.**
**v.**
**MAGNAT CORPORATION and George Bernard, Jr.**
**Civ. A. No. 63–1033.**

United States District Court
D. Massachusetts.

Sept. 10, 1965.

Supplemental Opinion Sept. 13, 1965.

Edward M. Swartz and Albert P. Zabin, Boston, Mass., for plaintiff.

Harold Katz, Boston, Mass., for defendant.

WYZANSKI, Chief Judge.

This Court has before it defendants' motions for directed verdicts on the first and third counts of the complaint (filed before the case was submitted to the jury, and at that time reserved by the Court) and defendants' motions to set aside the verdicts subsequently rendered on those counts as against the weight of the evidence.

This is a diversity action. B & B Electroplating Company, Inc., filed a complaint in three counts. The first and

third were premised on the alleged deceitful representations made respectively by Magnat Corporation and its president, George Bernard, Jr. The second count complains of a breach of an alleged oral contract made by defendant Magnat Corporation with plaintiff B & B Electroplating Company, Inc. Magnat Corporation counterclaimed that there was due to it $11,730 on account of sums advanced as credits against future work to be performed by B & B Electroplating Company, Inc., but which that company has not earned by performance.

The jury has returned verdicts in favor of the plaintiff on counts 1 and 3 in the amount of $22,500 each (the Court having indicated in its charge that if plaintiff prevailed on both counts 1 and 3, plaintiff would not be entitled to collect twice). The jury also returned verdicts for defendant Magnat Corporation on count 2, and in favor of the same corporation on its counterclaim in the amount of $9,931.

Behind the motions and verdicts, this is the story. Magnat Corporation manufactures steel and aluminum rollers for paper and textile products. Its president is Bernard. For its steel rollers it has long had many customers whose total demand is approximately 20,000 square inches per day. Steel rollers have long been satisfactorily copper-plated. Technical difficulties have always stood in the way of a satisfactory copper coating of aluminum rollers.

Through an outside source, Magnat Corporation had some of its aluminum rollers plated by B & B. The result being better than previously achieved, Magnat's president, Bernard, sought out Edwin Brown, who had organized B & B. With him, and later with his associate but not his relative, Herbert Brown, Bernard had conversations which became the focus of this case.

According to Bernard, he explained that there was a potential market for copper-plated aluminum rollers; that if a satisfactory product could be achieved, Magnat would have as customers those who were now buying from it copper-plated steel rollers; that B & B could have the copper-plating of Magnat's aluminum rolls if B & B would move to Easthampton, Massachusetts; and that he would introduce the officers of B & B to Massachusetts bankers in order to facilitate B & B borrowing money for the Easthampton construction.

The two Browns have a different version of these conversations. According to what B & B's complaint alleges, Bernard made representations "that his company was able to and was equipped to provide aluminum cylinders ready for electroplating; * * * that his company, Magnat Corporation, had existing orders and a present demand for the referred-to aluminum cylinders; * * * that the high speed color printing trade employed steel cylinders at the present time and that his company had orders for the lighter, more desirable, centrifugally cast aluminum cylinders * * * [and] that his orders for the plating of aluminum rollers would not fall under 20,000 sq. in. per day."

Following the conversations between Bernard and the Browns, Bernard took the Browns to meet two bankers, Faulkner, Vice President of the Valley Bank and Trust Company in Springfield, Massachusetts, and Evans, President of the Easthampton Savings Bank. Each of these institutions lent money to B & B. Both bankers were clear that at no time in the conversations which led up to the loans to B & B, did either the Browns or Bernard refer to a contract of any kind between B & B and Magnat. Nor did either of them recall any representations having been made by Bernard. Indeed, Faulkner testified that while his bank inquired as to whether Magnat would give a warranty of the amount of business to be supplied to B & B, Bernard flatly refused to give warranties of any kind or to guarantee any promises made by B & B to the bank.

No written contract or representation was offered in evidence or was claimed to have been made.

The account books of Magnat were introduced to show that upon its ledgers,

although under the rather peculiar heading of "accounts payable", there appeared the advance by Magnat to B & B of $11,730.

The jury returned a verdict for the defendant on count 2 of the complaint. This was clearly right, because the Browns themselves each testified that the contract upon which they had claimed was oral and could not in their opinion be performed within one year. The Statute of Frauds, Massachusetts General Laws, ch. 259, § 1, explicitly provides, as do all other statutes of frauds modelled upon 29 Car. 2 c. 3 that "[n]o action shall be brought * * * [u]pon an agreement that is not to be performed within one year from the making thereof; [u]nless the promise, contract, or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized."

Counts 2 and 3, upon each of which plaintiff won a verdict of $22,500, raised obvious issues of credibility. If Bernard were to be believed, no representation of the type set forth in the pleadings was made, no false statement of any kind was made, no intention existed upon his part to have B & B rely upon any representation except that Bernard's opinion was that business in copper-plating of aluminum cylinders would be available to B & B, provided its work was of high quality, and that in every respect Bernard acted subjectively in good faith and, tested by the standard of a reasonable man, objectively with accuracy.

The Browns' position is that they were reasonably led to believe by the words used by Bernard that he actually had orders on hand which could be readily converted into orders for copper-plating of aluminum cylinder rolls, and that if such rolls were plated by B & B there would be a minimum demand of 20,000 square inches per day for the indefinite future at the market price which the parties discussed.

There is no dispute among the parties that, in fact, after the Easthampton plant was built, Magnat gave to B & B only a few orders for copper-plating of aluminum rolls, which yielded only a few hundred dollars and that B & B sustained heavy losses of out-of-pocket expenses and made no profits.

My view is that Bernard scrupulously told the truth, both during the business negotiations with the Browns and at the trial before the Court and jury. Yet I can understand that the Browns were in good faith (though I believe mistaken) when they testified that they interpreted Bernard's words to mean not merely that he expressed his honest opinion as to the business B & B might get, but also he represented the actual business which was already available and would flow to B & B if the Easthampton plant were begun. I also understand how, when the Browns testified as to their interpretation, a jury could reasonably find that the Browns were telling the truth, that a reasonable man would have interpreted Bernard's words in the sense in which the Browns interpreted them, that Bernard made representations of fact as to specific items of future of business, that those representations of fact were material, that they were intended to induce reliance by B & B, that they actually did induce such reliance, and that such reliance caused damage to B & B in the amount of $22,500.

Under the circumstances just recited, I am not prepared either to grant either of the motions on which I reserved action and which requested me to direct verdicts on counts 2 and 3 for the defendants, or to grant the motions requesting me to set aside as against the weight of the evidence the verdicts B & B have secured on those counts.

No doubt, my unwillingness to grant the motions reflects deference to the Seventh Amendment to the United States Constitution as now interpreted by The Supreme Court of the United States, to the recent rulings of that Court, and the Court of Appeals of this Circuit, which allow tort plaintiffs to recover on a scintilla of evidence, and to a jury which I

gladly recognize seemed unusually able, attentive, and experienced.

Yet I am convinced that by allowing juries the scope which they now have to indulge in sentiment and to help out overly optimistic, careless, and needy plaintiffs at the expense of prudent and prosperous defendants, Courts are undermining the fabric of our society. Business is being converted from a profit-making mechanism in a free enterprise society to a cog in a social security insurance scheme.

Moreover, if the judgment bottomed on this jury's verdicts is affirmed by the Court of Appeals, it will stand as a horrid warning to the businessmen of New England. Stated realistically, the case at bar shows that a businessman who undeniably refused to give a warranty may be found by a jury on conflicting testimony to have made an oral representation which subjects him to quite as much liability as if he had given a warranty under seal. If affirmed, the judgment stands for the principle that when two companies contemplate potential business affiliations, if the joint enterprise goes on the rocks, the officers of the corporation that took the risk of loss and suffered it, by their testimony, flatly contradicted by the officers of the other corporation, may hold the second corporation liable for both the out-of-pocket losses and the unrealized profits which the first corporation attributes to the disappointment of its hopes.

Alarm at those potential consequences of affirming the judgment in this case may induce the Court of Appeals, as it will be reconstituted shortly, to reverse the trend of decision fostered by its predecessors. The Court as composed hereafter may find that the substantive law of Massachusetts, appropriate in a federal diversity jurisdiction case, permits a Court to take from the jury the opportunity to render verdicts such as this jury returned on counts 1 and 3. In short, a majority of the new Court may require that before a defendant can be held to an alleged oral representation, the evidence must be far more explicit and credible than it seems to me to have been in this case.

I should add that I have not overlooked the possibility of granting the last motions to set aside the verdicts as against the weight of the evidence. The reason that I am not granting those motions is that my action might properly be thought to be influenced to no small degree by my own strong belief in Bernard's credibility and in my equally strong conviction that, aside from their deserts as human beings, the case of the Browns had no legal merits. Inasmuch as my belief and conviction were obviously not shared by the jurors, I do not care to override their collective wisdom on what is, after all, ultimately a subjective matter of opinion.

All motions denied.

### SUPPLEMENTAL OPINION

I call the parties' attention to a line of inquiry to which they have not adverted.

At plaintiff's counsel's specific request, I instructed the jury that plaintiff could recover on counts 1 or 3, or both, if it proved the deceitful character of *ANY* of the alleged false statements set forth in the complaint. As a matter of law, at least one of those alleged statements may be regarded less as a representation of observable facts, or as a representation of Bernard's subjective opinion, than as a promise of future performance. Hence it might well be treated as actionable *SOLELY* as a claim sounding in contract, and thus subject, for example, to the precondition of a written memorial stipulated by the Statute of Frauds. Put more simply, the question is will courts tolerate an avoidance of the policy of the Statute of Frauds by allowing a plaintiff to use a tort action of deceit to recover on an oral promise not to be performed within a year.

If this point had been raised before me it would have deserved exploration. But, mindful of criticism directed at judges who act outside the issues pointed to and argued by counsel during the trial, see 65 Harv.L.Rev. 1281, 1296,

note 71, I did not on my own motion raise or rule upon this issue. Perhaps the Court of Appeals will now be invited by appropriate steps of counsel to enter, or to direct this Court to enter, the field. At any rate, since, presumably, that Court must consider whether there is substantial evidence to support the verdicts and whether in deceit cases, as in many fraud cases, the burden on plaintiff is to prove its case by clear and convincing evidence, (not merely a preponderance),—see 65 Harv.L.Rev. 1281, 1303, note 100—it would be natural for that Court *sua sponte* to address itself to the question whether in a tort action for damages caused by an alleged promissory representation to perform over a period of more than one year, plaintiff must meet the policy and criteria, if not the explicit provisions, of the Statute of Frauds.